UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

EMILE T. PETRO, Jr.; ZOE C. PETRO;
BRYAN SALIBA; and JULIAN BEALL,

Plaintiffs,

v. CASE No.: 3:12-cv-491-MCR/CJK

TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA,

Defendant.
_______________________________________/

**DEFENDANT TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM OF LAW**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Travelers Casualty and Surety Company of America ("Travelers"), through its undersigned counsel, moves for summary judgment as a matter of law. Because no genuine issue as to any material fact exists and the issues regarding coverage and the enforceability of the consent judgment can be decided as a matter of law, summary judgment is appropriate.

**INTRODUCTION AND UNCONTROVERTED FACTS[1]**

This is an action for declaratory judgment and breach of contract regarding Travelers' duties as an insurer under a policy it issued to its insureds. Plaintiffs, who doggedly pursued Travelers' insureds in an underlying state court lawsuit that lasted close to five years, have accused Travelers, which covered the defense of that litigation, of failing to fulfill its obligations to defend its insureds.

---

[1] Pursuant to Local Rule 56.1(A), Travelers has attached a separate Statement of Material Facts in Support of its Motion for Summary Judgment as Exhibit "A."

The undisputed facts, however, show that for four years and eleven months, Travelers provided its insureds with a skillful defense to Plaintiffs' vigorously prosecuted lawsuit, which the insureds never rejected. Then, on the eve of trial and over Travelers' objection, these insureds entered into a settlement agreement with the Plaintiffs for an amount well in excess of policy limits, thereby depriving Travelers of its important right to defend the claim at trial. Plaintiffs, as assignees of Travelers' insureds, now seek to enforce this eleventh hour *Coblentz* agreement[2] against Travelers.

In 2004, Travelers issued a Non-Profit Management and Organization Liability Insurance Policy, Policy No. 10442290 (the "Policy"), attached as Exhibit "B," to Shelter Cove Condominium Association, Inc. ("Shelter Cove").[3] The Policy's limit of liability was $1 million, which would be reduced by costs and fees incurred in defending claims. Following Hurricane Ivan in 2004, an effort was undertaken to reconstruct Shelter Cove's building, which had been badly damaged by the storm. This process did not go smoothly, and in July 2007, the Plaintiffs here filed a suit against Shelter Cove in the Circuit Court of Escambia County (Case 07-CA-1631, the "underlying action"). The complaint sought the termination of the condominium, equitable relief, and a declaratory judgment.

In 2007, shortly after being notified by Shelter Cove of the underlying action, Travelers agreed to defend Shelter Cove under a reservation of rights and retained the law firm of Litchfield Cavo, LLP to assume the association's defense. *See* Reservation of

[2] A "*Coblentz* agreement" (after *Coblentz v. Am. Sur. Co. of N.Y.*, 416 F.2d 1059 (5th Cir. 1969)) is a tactic available only when an insurer refuses to defend an insured. The insured may be entitled to enter into a consent judgment that is binding on the insurer. Although *Coblentz* is not mentioned in the settlement or the final judgment, the consent agreement entered into by the parties in the underlying case is properly characterized as a *Coblentz* agreement. *See* Shelter Cove Board Resolution (attached as Exhibit "C"), ¶ 8.

[3] The Policy issued in 2004 was effective for three years and in 2007 it was renewed for three additional years through 2010.

Rights Letter of August 21, 2007 (Exhibit "D") and Assignment Confirmation of August 28, 2007 (Exhibit "E"). Shelter Cove immediately accepted this defense. *See* Shelter Cove Correspondence (Exhibit "F"). The reservation of rights was based on possible coverage defenses, including whether the damages suffered were a "Loss," the fraud exclusion, the limitation on paying insureds for injunctive relief, and the restriction against insureds gaining a profit or advantage from the resolution of a claim. Travelers also informed Shelter Cove that defense costs would reduce the Policy's limit of liability. *See* Exhibit D.

In February 2010, the Plaintiffs filed an Amended Complaint in the underlying action, adding various counts and two insured persons, board members Holly Gallopo and Joel Earheart, as defendants. The Plaintiffs asserted that Shelter Cove, Gallopo, and Earheart misappropriated insurance funds and violated Florida law and a number of rules of the condominium association in the reconstruction of the damaged building, and that Gallopo and Earheart were not only negligent but had committed fraud, made intentional misrepresentations, engaged in a civil conspiracy, and breached their fiduciary duties. *See* First Amended Complaint in the underlying action (Exhibit "G"). Travelers continued to defend Shelter Cove under a reservation of rights utilizing Litchfield Cavo.

Throughout the entirety of the state court suit, Plaintiffs believed all of these allegations in the Amended Complaint in the underlying action against Shelter Cove, Gallopo, and Earheart to be well-founded. *See, e.g.,* deposition of Emile Petro (Exhibit "H"), 32:20-35:9, 66:25-68:10; deposition of Bryan Saliba (Exhibit "I"), 31:24-33:24. Also, notably, Plaintiffs believed their claims against Shelter Cove and several of its directors were each supported by the same set of facts. *See* Exhibit I, 64-70.

For four years and eleven months, Litchfield Cavo ably defended Shelter Cove—and later Gallopo and Earheart—against Plaintiffs in the underlying action. The association and the insured directors continued to accept the defense provided by Travelers, and at no point prior to the settlement of the underlying action did they renounce or reject Litchfield Cavo's representation. *See* deposition of Holly Gallopo (Exhibit "J") 20:7-21:17, 34:5-14; deposition of Joel Earheart (Exhibit "K"), 79:24-81:13, 87:6-88:16, 108:21-109:20.

This all changed on the eve of the trial, scheduled to begin on May 21, 2012. On that day, the parties agreed to settle the lawsuit and the start of trial was pushed back one week. *See* Exhibit K, 23:11-24:24. On May 22, 2012, after a final settlement offer by Plaintiffs' counsel, Shelter Cove demanded that Travelers consent to a settlement and threatened to reject the almost five year-old defense of Litchfield Cavo and enter into a *Coblentz* agreement with Plaintiffs if Travelers declined. *See* Final Settlement Offer (Exhibit "L"); Settlement Demand (Exhibit "M"); *see also* Exhibit C. After John Godbout, claims counsel at Travelers, advised that the insurer would not consent to the settlement proposal presented by Plaintiffs, Shelter Cove abruptly terminated Litchfield Cavo on May 24 and filed a Joint Motion for Consent Judgment (with the Plaintiffs) requesting that the court ratify a settlement agreement and enter judgment against Shelter Cove—but not Gallopo and Earheart—for $1,517,040, an amount well in excess of policy limits (especially considering Travelers had already expended over $350,000 defending the suit, thereby reducing by that amount the $1 million policy limit). *See* Letter from Godbout (Exhibit "N"); Settlement Agreement (Exhibit "O"); Joint Motion for Consent Judgment (Exhibit "P"); Termination email (Exhibit "Q"); deposition of John Godbout (Exhibit "R"), 122:1-9, 138:2-6, 176:16-25; *see also* Exhibit K, 88:12-16.

A primary focus of the case was fraud, misrepresentation and other intentional misconduct (which both Plaintiffs and Shelter Cove knew were not covered claims). *See* Letter from Plaintiffs' counsel (Exhibit "S"). Indeed, after almost four years of discovery, Plaintiffs sought to amend their complaint in the underlying action to plead punitive damages, alleging, *inter alia*, that the defendants were openly hostile to Plantiffs, that defendants conspired to conceal their wrongful acts from Plaintiffs, that defendants knowingly withheld information from Plaintiffs, and that defendants proposed material alterations to the condominium building despite knowing this was not permitted absent unit owner approval. *See* Second Motion to Amend Complaint and Plead Punitive Damages (Exhibit "T"). Despite the focus on the fraud and intentionally wrongful conduct, the consent agreement referenced neither claim but instead contained a stipulated finding of negligence (which both Plaintiffs and Shelter Cove believed was a covered claim). A Final Judgment for negligence was entered against Shelter Cove—but not defendant directors Gallopo and Earheart—on Counts 1 (Violation of Governing Documents), 2 (Violation of Ch. 718), and 3 (Negligence) of the Plaintiffs' First Amended Complaint for $1,267,040 in damages plus $250,000 in attorney's fees. *See* Final Judgment (Exhibit "U"). Pursuant to the terms of the settlement, Shelter Cove assigned to Plaintiffs its rights against Travelers relating to the underlying action. The settlement also stipulated that the agreement did not constitute an admission as to any facts or liability by any of the parties.

Plaintiffs, as assignees, subsequently filed the current suit, seeking to enforce the consent judgment against Travelers and recover the $1,517,040. In addition to counts for declaratory judgment (Count 1) and breach of the policy (Count 2), Plaintiffs alleged bad faith (Counts 3, 4, and 5) by Travelers. These bad faith claims were abated by the Court's

order of July 10, 2013 pending a determination as to whether Travelers must pay the amount reflected in the consent judgment.[4] For the reasons discussed below, Travelers submits that the final judgment is unenforceable against it and therefore Travelers is entitled to summary judgment as a matter of law.

## MEMORANDUM OF LAW

### I. Summary Of The Argument

Summary judgment must be granted to Travelers on Counts 1 and 2 of Plaintiffs' Amended Complaint. These counts allege, *inter alia*, that "Travelers is obligated pay Plaintiffs the entire amount of the Final Judgment" (¶ 11), that "Travelers is obligated to provide coverage for each of these wrongful acts" (¶ 16), and that "Travelers breached the Policy by… failing to pay Plaintiffs the amount awarded in the Final Judgment…" (¶ 27). Because the consent judgment does not constitute a valid *Coblentz* agreement, it is unenforceable against Travelers.

To recover under this agreement, Plaintiffs must prove coverage, a wrongful refusal to defend, and that the settlement is reasonable and entered into in good faith. They fail on each prong. Fatal to Plaintiffs' action is the undisputed fact that Travelers never abandoned the defense of its insured, and its insured never rejected that defense. In fact, Travelers met or exceeded its obligations under the Policy and Florida law by providing a thorough defense to a vigorously pursued lawsuit. Additionally, Shelter Cove violated numerous provisions of the Policy, various exclusions apply to abrogate coverage for the alleged loss,

[4] The sole issue now is whether the consent judgment is enforceable against Travelers, and any litigation concerning bad faith is inappropriate at this juncture. *See Vanguard Fire & Cas. Co. v. Golmon*, 955 So. 2d 591, 594 (Fla. 1st DCA 2006) (noting that "[the insurer] will suffer irreparable harm if it is forced to defend against both the breach of contract and bad faith claims simultaneously."). Any attempts by Plaintiffs to inject allegations or insinuations of bad faith into the narrow inquiry at bar will contravene established Florida law and are impermissible.

and coverage is limited by the fact that all alleged damages resulted from Related Wrongful Acts. The law, the Policy, and fairness dictate that Plaintiffs not be allowed to recover any portion of the consent judgment from Travelers.

## II. **Summary Judgment Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and affidavits, if any, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When a moving party has discharged its burden, the non-moving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions," designate specific facts showing there is a genuine issue for trial. *Id.* at 324. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There must be a sufficient showing that the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Finally, "[w]ith respect to determining insurance coverage issues, summary judgment is generally appropriate inasmuch as the construction and legal effect of a written contract are matters of law to be determined by the court." *Sinni v. Scottsdale Ins. Co.*, 676 F. Supp. 2d 1319, 1323 (M.D. Fla. 2009).

## III. **Plaintiffs and Shelter Cove Did Not Enter Into An Enforceable *Coblentz* Agreement**

After accepting without complaint for close to five years the defense funded by Travelers, Shelter Cove entered into an agreement with Plaintiffs that found the association liable to Plaintiffs for an amount in excess of $1.5 million. Plaintiffs seek to enforce this

judgment against Travelers by characterizing the settlement as a valid *Coblentz* agreement. "In Florida, a party seeking to recover under a *Coblentz* agreement must prove: (1) coverage; (2) a wrongful refusal to defend; and (3) that the settlement was objectively reasonable and made in good faith." *Sinni,* 676 F. Supp. 2d at 1324, *citing Chomat v. N. Ins. Co. of N.Y.*, 919 So. 2d 535, 537 (Fla. 3d DCA 2006). The burden of proof is on the Plaintiffs in the instant case and, as demonstrated below, they fail on all three prongs.

**(a) Travelers did not wrongfully refuse to defend Shelter Cove in the underlying action**

Travelers will first address the second prong of a *Coblentz* agreement – the failure to defend – because it is patently obvious that Plaintiffs cannot prove that element. At no point did Travelers refuse to defend – much less wrongfully refuse to defend – Shelter Cove. This alone is enough to invalidate the *Coblentz* agreement relied on by the Plaintiffs, making the settlement unenforceable against Travelers. *See First Am. Title Ins. Co. v. National Union Fire Ins. Co.*, 695 So. 2d 475, 477 (Fla. 3d DCA 1997). ("while an insured is free to enter into a reasonable settlement when its insurer has wrongfully refused to provide it with a defense to a suit, we find that the insured is not similarly free to independently engage in such settlements where, as here, the insurer had not declined a defense to suit.").

"Under Florida law, an insurer's duty to defend is broader than its duty to indemnify and is determined by the allegations of the complaint if suit has been filed." *Rockhill Ins. Co. v. Coyote Land Co.*, 2011 U.S. Dist. LEXIS 11040 (N.D. Fla. 2011). Despite serious doubts about whether Shelter Cove would be afforded coverage under the policy (discussed *infra*), Travelers fulfilled its duty to defend Shelter Cove by appointing a

well-known firm to defend the association and the directors against every charge, including the non-covered fraud and conspiracy counts. The insureds never objected to or complained about the defense, and to the contrary embraced it. *See* Exhibit F. Earheart, one of the defendants, testified that "Ben Lofaro [the Litchfield Cavo partner who handled the Shelter Cove matter] represented us perfectly." Exhibit K, 13:14-15. The insureds also recognized that Travelers retained Litchfield Cavo to represent them personally:

> Q: Was it your understanding that Travelers did go forward and defend Shelter Cove in the underlying lawsuit?
> A: Yes.
>
> Q: And it retained Mr. Lofaro and his law firm to represent Shelter Cove?
> A: Yes, yes, yes, yes.
>
> Q: And then at some point, you and Mr. Earheart were brought in as defendants. Do you recall that?
> A: Yes.
>
> Q: And at that time is it your understanding that Mr. Lofaro started defending you and Mr. Earheart personally?
> A: He defended Shelter Cove.
>
> Q: Okay. Who, if anyone, defended you?
> A: Well, I guess it was [Mr. Lofaro], and I had Atty. Billy Walters. He defended us, too.
>
> Q: But did you understand that Mr. Lofaro was also representing you?
> A: Yes, and there was somebody before [Mr. Lofaro], actually, from Travelers.
>
> Q: Someone at his firm?
> A: Yes.

Exhibit J, 20:13-21:9. The insureds also did not reject the defense:

> Q: In early 2008, as a representative of Shelter Cove, did you tell Travelers that Shelter Cove wanted to reject the defense and fire Ben Lofaro?

A: No

Q: And did you do that in 2009?
A: No.

Q: And did you do that in 2010?
A: No.

Q: How about 2011?
A: No.

Q: You didn't do it until May 24 of 2012, correct?
A: That's correct.

Q: I'm talking about you personally and you as a representative of Shelter Cove. Would your answers be the same?
A: Yes, it will.

Exhibit K, 108:21-109:11.

Travelers never abandoned this defense, it participated in good faith in several mediations in the underlying action, and even offered to settle on various occasions[5] in spite of the questions looming about the existence of coverage. The fact that Travelers defended Shelter Cove under a reservation of rights has no bearing on whether a proper defense was provided or whether the consent judgment is enforceable against Travelers. *Travelers Indem. Co. v. Royal Oak Enters.*, 344 F. Supp. 2d 1358, 1370 (M.D. Fla. 2004) ("It is also well settled that an insurer does not breach its duty to defend by offering to defend only under a reservation of rights."). Even in cases where insurers have defended under a reservation of rights, Florida courts have limited insureds' rights to enter into *Coblentz* agreements without their insurer's consent. *See id; see also United National Ins. Co. v. Jacobs*, 754 F. Supp. 865 (M.D. Fla. 1990). The retention of Litchfield Cavo renders

[5] For example, in June 2007, Travelers' claim counsel communicated to the insureds' attorney, Ben Lofaro, that Travelers' settlement range was $250,000 - $275,000. *See* Claim Notes (Exhibit "V"), p. 16 of 53.

it indisputable that Travelers did not wrongfully refuse to defend Shelter Cove, and the fact that this defense was funded under a reservation of rights does not affect the enforceability (or lack thereof) of the *Coblentz* agreement at issue.

More importantly, "because a defense subject to a reservation of rights does not constitute a wrongful refusal to defend, **an insurer retains the right to control the defense**." *Cont'l Cas. Co. v. Jacksonville*, 283 Fed. Appx. 686, 689–90 (11th Cir. 2008) (emphasis added); *Gallina v. Commerce & Indus. Ins*., 2008 U.S. Dist. LEXIS 75675, *26-28 (M.D. Fla. 2008) (granting an insurer summary judgment because its contractual duty to defend was accompanied by a likewise important contractual "right to manage the litigation and resolution of the claims" that the insured violated), *aff'd.* 375 Fed. Appx. 935 (11th Cir. 2010). If an insured accepts the defense under a reservation of rights proffered by an insurer, permits the insurer to defend the case, and allows the insurer to negotiate possible settlements, the insurer gains "exclusive control" of the litigation. *See Jacobs,* 754 F. Supp. 865. The law *and* the terms of the Policy require an insured to cede control of the defense to the insurer. Part B of the Insuring Agreement states, among other things, that:

> the Insureds agree not to settle any Claim, incur any Defense Costs or otherwise assume any contractual obligation or admit any liability with respect to any Claim without the Insurer's written consent, which shall not be unreasonably withheld. Travelers shall not be liable for any settlement, Defense Costs, assumed obligation or admission to which it has not consented.

Section I.B. of the Policy, commonly referred to as the "cooperation clause," provides:

> The Insurer shall have the right and duty to defend any Claim covered by this Policy… The Insureds agree to provide the Insurer with all information, assistance and cooperation which the Insurer reasonably requests and agree that in the event of a Claim the Insureds will do nothing that may prejudice the Insurer's position or its potential or actual rights of recovery.

Exhibit B. By abruptly and unilaterally settling with the Plaintiffs on the eve of trial, Shelter Cove deprived Travelers of its right to control the defense and the association (and Plaintiffs as assignees) lost the right to recover under the Policy and Florida law.[6] This result is consistent with *Jacobs,* cited *supra*, where the court ruled that when an insurer gains exclusive control over litigation (by proffering a defense under a reservation of rights which is accepted by the insured), the insured breaches the policy by entering into a settlement agreement without the consent of the insurer, thereby relieving the insurer of any further obligation. 754 F. Supp. at 871.

Although the record clearly shows that Shelter Cove accepted the defense provided by Travelers for almost five years before suddenly settling on the brink of trial, it is anticipated that Plaintiffs will try to argue that Shelter Cove rejected the defense, entitling it to settle without Travelers' consent for whatever amount it deemed reasonable. If an insured actually rejects a defense provided under a reservation of rights, courts, under limited circumstances, may allow the enforcement of a resulting consent judgment against its insurer. *See Aguero v. First Am. Ins.* Co, 927 So. 2d 894 (Fla. 3d DCA 2005).[7]

---

[6] Also, it is clear Travelers' consent to settle was not unreasonably withheld. Shelter Cove and its officers insisted no unlawful conduct took place. *See* Exhibit J, 21:22-24:21; Exhibit K, 11:1-12:11. Plaintiffs also steadfastly supported their allegations of fraud throughout the underlying action. *See* Exhibit H, 32:20-35:9, 66:25-68:10; Exhibit I, 31:24-33:24. Either one of these outcomes—the insureds having done nothing wrong or Plaintiffs' allegations of fraud being true—would have decreased Travelers' exposure. Furthermore, other courts in similar circumstances have held that an insurer may lawfully withhold consent to settle if a settlement demand is in excess of policy limits. *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 850 (Tex. 1994) ("The principal commentators in this area have identified few cases that even consider the possibility of a breach of the duty to settle absent a demand within policy limits.").

[7] *Aguero* involved the reversal of summary judgment in favor of the insurer, but it is distinguishable from this case. The court found that there was a question of fact as to whether the insured rejected the insurer's *offer* to defend *before* the insurer ever retained counsel for its insured. *See* 927 So. 2d 894. Here, Shelter Cove accepted the defense proffered by Travelers and thus lost the right (which the insured in *Aguero* arguably exercised) to reject the defense.

However, courts have not upheld *Coblentz* agreements where the insured accepts a defense for an extended period of time and abruptly (and for no good reason) rejects it and settles, which is exactly what happened here.

In *Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312 (M.D. Fla. 2007), *aff'd,* 283 Fed. Appx. 686 (11th Cir. 2008), the insurer defended the insured city in the underlying case for several years before the latter engaged in settlement negotiations and entered into a settlement agreement with the plaintiffs to which the insurer did not consent. In granting the insurer summary judgment because the city's conduct discharged any of the insurer's duties, the court wrote "[it] would seem inequitable to allow an insured to take control of the litigation at the eleventh hour so as to preserve its rights to coverage after it has (1) accepted a defense from its insurer, and then (2) prejudiced the insurer by settling the claim behind the insurer's back." *See id.* at 1344. In *Zurich Am. Ins. Co. v. Frankel Enters.*, 509 F. Supp. 2d 1303 (S.D. Fla. 2007), the insured made an argument similar to the one Plaintiffs will likely make here, that the "duty to defend" includes a duty to settle, and that not settling when an offer is made is tantamount to wrongfully refusing to defend. In rejecting this argument and entering summary judgment for the insurer, the court noted:

> [defendants' interpretation] would lead to incongruous results such that every time an insurer defends under a reservation of rights and does not offer to settle during mediation (or, any time after suit is filed), the insured, without rejecting the defense, could unilaterally settle with the plaintiff beyond the policy limits and bind the insurer. To adopt such a rule would negate the opportunity for the insured to prevail at trial or settle within the policy limits, with no personal exposure to the insured.

*Id. at* 1315. The interpretation rejected in *Frankel* is the only argument Plaintiffs can make that Travelers wrongfully refused to defend Shelter Cove, and it is a weak one at that. The

*Frankel* court found that "under the terms of the policy, [insured's] unilateral action relieved [insurer] of any obligation to pay the consent judgment."[8] *Id.* The result should be the same here, as Travelers' Policy has a cooperation clause and requires consent to any settlement.

The reality is that Shelter Cove, Gallopo, and Earheart accepted and benefited from the defense provided by Travelers for four years and eleven months, and eventually "[the insured's] premature rejection of [the insurer's] defense and its settlement with [Plaintiffs] foreclosed a determination of whether [the insured] would be exposed to liability for damages in excess of the Policy, as contemplated by the Policy and Florida law." *Gallina*, 2008 U.S. Dist. LEXIS 75675 at *28. In these situations, courts do not allow third party plaintiffs to enforce *Coblentz* agreements against insurers and have disposed of these cases at summary judgment. *See id.* The 11th Circuit affirmed *Gallina,* writing:

> Practically, [insured's] act of prematurely settling the case in violation of the insurance policy prevents this court from knowing whether [insured] would have suffered damages in excess of the policy limits. The facts in this case are undisputed that [insurer] at all times defended [insured], [insured] at all times accepted the defense, yet [insured] breached its contract with [insurer] by settling its case with the injured party, without [insurer's] consent, and rejecting [insurer's] unconditional defense.

375 Fed. Appx. at 937. Plaintiffs in this action seek to recover on a theory similar to the one used by the plaintiff in *Gallina*. Therefore, Travelers should prevail for the same reasons as the insurer in *Gallina*. *See id.* Shelter Cove, which was furnished with a skillful

[8] The policy in *Frankel* provided: "A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative."

defense that Travelers never abandoned -- despite serious doubts about coverage under the Policy -- should not and legally cannot benefit from its "eleventh hour" unilateral settlement that breached the Policy and defied the law. Because Travelers complied with its defense obligations, the *Coblentz* agreement is not enforceable against it.

**(b) The Policy does not cover the entire loss suffered**

The Plaintiffs have the burden of proving that the claim against Travelers in the underlying case is covered. "[T]he mere entry of a consent judgment does not establish coverage." *Sinni*, 676 F. Supp. 2d at 1324. Stated differently, "notwithstanding the allegations in the underlying complaint or stipulated facts in the consent judgment, the plaintiff's underlying claims must actually come within the coverage of the policy (i.e., on the merits, the insurer has a contractual duty to indemnify)." *Id.* Pursuant to the policy Travelers issued to Shelter Cove, there is no coverage for the alleged loss in this case. This alone is enough to invalidate the *Coblentz* agreement relied on by the Plaintiffs. *See Sinni,* 676 F. Supp. 2d 1319 (finding that a *Coblentz* agreement was unenforceable because no coverage existed under the policy, even though the insurer refused to defend the insured).

Under Florida law, "insurance contracts are construed according to their plain meaning." *Evanston Ins. Co. v. Heeder*, 490 Fed. Appx. 215, 216-217 (11th Cir. 2012), *quoting Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005). Furthermore, "courts should read [a] policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Morales v. Zenith Ins. Co.*, 714 F.3d 1220, 1227 (11th Cir. 2013), *quoting U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 877 (Fla. 2007). With respect to coverage and *Coblentz* agreements, "when the insured or *Coblentz* plaintiff sues the insurer in contract for indemnification, policy exclusions may

be raised as defenses, because those issues have neither been litigated nor waived." *Sinni*, 676 F. Supp. 2d at 1332. Finally, "[b]ecause the parties' relationship is strictly contractual at the indemnification stage, neither the insured nor a *Coblentz* plaintiff can re-write the policy to provide benefits for non-covered injuries that have simply been cloaked in causes of action for which there superficially appears to be coverage." *Id.* Here, there are numerous reasons coverage is vitiated for Shelter Cove's claim.

**i. Coverage is limited by the fraud exclusion**

The discovery in the underlying case revealed that the defendant directors violated various provisions of the Florida Condominium Act, made material representations to the Plaintiffs, and withheld information from certain unit owners. *See* Exhibit S. Credible evidence was also obtained to suggest that approval letters were backdated. The Plaintiffs, who now try to recover on (covered) claims of negligence, testified that they have never wavered in their beliefs that Shelter Cove engaged in *dishonest and fraudulent* conduct in connection with the rebuilding effort:

> Q: So in paragraph 48 [in Count 6 for Fraud of the Amended Complaint in the underlying action], you say that the association received proper written consents from the unit owners for the reconstruction, and then in paragraph 49, you say that the representations regarding those written consents were false and known to be false. Do you stand by those --
> A: Yes.
>
> Q: Do you stand by those allegations?
> A: Yes.
>
> Q: Okay. In paragraph 50 you allege that the representations concerning the association's receipt of proper written consents were quote, were made to induce plaintiffs to rebuild the building and allow the association to use

> plaintiffs' insurance proceeds, unquote. Do you stand by that allegation?
> A: Which number?
>
> Q: Paragraph 50 on page eight of 11.
> A: Yes, they negligently --yes.
>
> Q: So you stand by the allegation in paragraph 50, correct?
> A: Yes.
>
> Q: You believed it to be a true allegation when you made it back in 2010, and you believe it to be a true allegation today?
> A: Yes.
>
> Q: Going to paragraph 51. It says, quote, the association knew of plaintiffs' reliance on the representation and failed to correct, clarify or further amplify the representations, unquote. Mr. Petro, when you made that allegation back in 2010, when you filed this amended complaint, did you believe that allegation to be true?
> A: Yes.
>
> Q: Okay. And do you stand by that allegation today --
> A: Yes.

Exhibit H, 32:25-35:9.

> Q: That's -- so just to be clear, when you filed this in February of 2010, you believed that the representations referenced in paragraph 48 were as you characterized them in paragraph 49, quote, false and at the times made, known to be false, should have been known to be false, or made with gross negligence and recklessness. Is that a fair statement?
> A: Yes.
>
> Q: That's what you believed in February of 2010, and that's what you believe as you sit here today; is that right?
> A: That is correct.

Exhibit I, 33:13-24.

Perhaps mindful of how these dishonest actions by the defendant directors would affect coverage, Plaintiffs and Shelter Cove entered into a judgment based solely on a stipulated finding of negligence, a tactic discussed further below. Still, deliberate fraudulent activity on the part of several insureds was alleged and pursued vigorously in discovery, and if the case had been allowed to proceed to trial and judgment had been entered against them on those counts, Exclusion 10 in the Policy would have been implicated.[9]

Plaintiffs will likely point out that the consent judgment is based on negligence, and not fraud. However, in determining coverage, a court will look to the substance of the original claim, not simply how the claim was characterized in the consent judgment. See *Sinni*, 676 F. Supp. 2d at 1331 ("An insurer faced with a *Coblentz* action has the right to litigate its contractual duty to indemnify on the actual facts of the underlying litigation."). Another federal court in Florida has expressed this principle as follows:

> Therefore, notwithstanding the allegations against the insured, if the facts show that the insured's liability stems from a claim for which no coverage is provided under the policy, the insurer owes no duty of indemnification. This premise holds true even where, as here, the insured's liability was arrived at through a settlement of the action against the insured, because a settlement does not, by itself, obligate the insurer to pay for a non-covered claim. Instead, the insurer's duty to indemnify a settlement obligation must be measured by the facts 'inherent in the settlement' or, in other words, the facts extant at the time the settlement was reached.

*Royal Oak*, 344 F. Supp. 2d at 1366. In *Royal Oak*, an insurer who had already paid a claim sought to recoup the amount it disbursed by alleging that a policy exclusion applied,

[9] Exclusion 10 denies coverage for any loss "brought about or contributed to by any deliberately fraudulent or dishonest act or omission or any purposeful violation of any statute or regulation of such insured" where a judgment or final adjudication adverse to an insured establishes the wrongful conduct.

limiting what the insured was entitled to recover. Since the insurer relied only on allegations in the complaint rather than the extant facts in the case to support its argument, the court ruled against it. *See id.* at 1366-7. Here, the actual facts present in the underlying action—rather than assertions made in pleadings and other court documents—must determine the existence of coverage. Therefore, the mere reference to negligence in the Motion for Consent Judgment and Final Judgment cannot alone create coverage for the alleged unlawful acts of Shelter Cove.

**ii. The insureds' alleged unlawful conduct constituted Related Wrongful Acts and therefore the policy limits do not "stack" as claimed by Plaintiffs**

Plaintiffs assert in their Amended Complaint that the insureds committed three separate wrongful acts spread out over two policy periods. In the underlying action, Plaintiffs stated that "a plain reading of the liability policy issued by Travelers indicates that there is at least $5 million of coverage for Plaintiffs' claims (limit of $1 million for the separate wrongful acts that occurred during each of the five relevant policy years)." *See* Settlement Negotiation Position (Exhibit "W"). Though the exact numbers have changed, it is clear Plaintiffs believe the policies "stack" and afford coverage in excess of $1 million (the Policy's stated limit of liability). This is an incorrect interpretation that is contradicted by the terms of the Policy. The reality is that the underlying action resulted completely from the reconstruction of the Shelter Cove's building.

Section II (Definitions), Paragraph Q broadly defines "Related Wrongful Acts" as "Wrongful Acts that arise out of, are based on, relate to or are in consequence of, the same facts, circumstances, or situations." The acts that allegedly caused damages to Plaintiffs in the underlying action clearly all "[arose] out of, are based on, relate to [and] are in

consequence of" the association and several of its directors' response to the damage caused by Hurricane Ivan. If Plaintiffs' allegations are to be believed, Shelter Cove and its two directors mismanaged insurance proceeds, conspired, misrepresented, and violated state law and the association's governing documents—all in order to secure valid approval for the building's reconstruction and make unlawful improvements.

In fact, Plaintiffs' own testimony confirms these alleged wrongful acts were all interconnected. When asked at deposition to provide factual support for the allegations made in Counts 2 (Violation of Ch. 718) and 3 (Negligence), Plaintiff Saliba pointed to many of the actions referenced in Count 1 (Violation of Governing Documents) as the factual bases for Counts 2 and 3.[10] Because the underlying action arose entirely out of a common nucleus of operative facts—Shelter Cove's handling of the rebuild effort—all counts are treated as one claim and Plaintiffs may make this claim in one Policy period, capping the limit of recovery related the underlying action at $1 million (the policy limit) less any amounts expended on the defense of the insureds. *See* Exhibit B, Section V(A)(2).

Case law also supports Travelers' reasoning that all the alleged unlawful acts by Shelter Cove, Gallopo, and Earheart fall within the definition of "Related Wrongful Acts." As an initial matter, the word "related" is to be given its plain meaning. *See Continental*

---

[10] When prompted to give examples of how the association committed waste or incurred excess costs (alleged in ¶ 27, Count 3 of the First Amended Complaint in the underlying action), Saliba cited from Count 1, ¶ 13-C ("making or allowing alterations and additions to portions of Plaintiffs' units or the Phase I Apartment Building which are to be maintained and repaired by the Association without first obtaining the written approval of all owners whose units are to be effected [sic] and the approval of the Board of Directors of the Association"), 13-D ("failing to file with the Association proper plans for such alterations or additions prior to commencement of the work"), 13-F ("making or allowing alterations and further improvements to the Condominium common elements and limited common elements without obtaining the required consent from unit owners"), 13-I ("failing to properly manage and disburse insurance proceeds relating to the Condominium"), and 13-J ("attempting to impose assessments and costs on Plaintiffs for repairs and betterments to individual units and the above alterations, additions, and further improvements."). *See* Exhibit I, 64-70.

*Cas. Co. v. Wendt,* 205 F.3d 1258, 1262 (11th Cir. 2000). "Courts analyzing the 'relatedness' of claims in situations involving similar policy language consider, among other factors, whether the **parties are the same**, whether the claims all arise from the **same transactions**, whether the 'wrongful acts' are contemporaneous, and whether there is a **common scheme or plan** underlying the acts." *Capital Growth Fin. LLC v. Quanta Spec. Lines Ins. Co.*, 2008 U.S. Dist. LEXIS 65814, 11-12 (S.D. Fla. 2008) (emphasis added). The *Capital Growth* court held that wrongful acts by securities traders which occurred over four years and shared "place, opportunity and pattern" were logically linked by a "sufficient factual nexus" and "interrelated" as defined by the policy, even though the perpetrators made different misrepresentations to various prospective investors.[11] *See id.* at 12-13.

Applying a similar analysis to the instant case yields the same result. Plaintiffs' alleged damages were caused by the same parties (Gallopo, Earheart, and Shelter Cove through these two members), the same facts led to the various counts alleged in the underlying action,[12] and there was a clear common goal underlying all the unlawful acts—the desire to reconstruct Shelter Cove's building after the hurricane and preserve the condominium association. These factors set out in the case law, coupled with a sensible reading of the Policy and interpreting the term "related" according to its plain meaning, clearly demonstrate that all of the unlawful conduct alleged by Plaintiffs constituted "Related Wrongful Acts" as defined by the Policy. Therefore, this Court should find that to

[11] The policy in *Capital Growth* defined "interrelated wrongful acts" as "any 'wrongful acts' that are: 1. similar, repeated or continuous; or 2. connected by reason of any common fact, circumstance, situation, transaction, casualty, events, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, event, decisions or policies."

[12] *See* Exhibit I, 64-70.

the extent there is any coverage afforded by the Policy, the matter should be considered one claim and subject to one policy period's limit of liability.

**(c) The settlement Shelter Cove and Plaintiffs agreed to was neither reasonable nor entered into in good faith because it required Travelers to pay in excess of the Policy's limit**

Plaintiffs and Shelter Cove stipulated to a finding of negligence and set damages at over $1.5 million. To recover under a *Coblentz* agreement, Plaintiffs must show the settlement is reasonable because "[t]he real concern… is that the settlement between the claimant and the insured may not actually represent an arm's length determination of the worth of the plaintiff's claim." *Steil v. Florida Physicians' Ins. Reciprocal*, 448 So. 2d 589, 592 (Fla. 2d DCA 1984).

A settlement in these circumstances is evaluated under a "reasonable person" standard. *Chomat v. Northern Ins. Co.*, 919 So. 2d 535, 538 (Fla. 3rd DCA 2006). "[P]roof of reasonableness is ordinarily established through use of expert witnesses to testify about such matters as the extent of the defendant's liability, the reasonableness of the damages amount in comparison with compensatory awards in other cases, and the expense which would have been required for the settling defendants to defend the lawsuit." *Id*. A court must also consider whether a settlement is reasonable "in view of the degree of probability of the insured's success and the size of the possible recovery." *Independent Fire Ins. Co. v. Paulekas*, 633 So.2d 1111, 1114 (Fla. 3d DCA 1994). Under this framework, Plaintiffs' settlement with Shelter Cove was unreasonable.

Plaintiffs' earlier settlement demands contemplated accepting less than the approximately $1.5 million awarded in the Final Judgment. *See* Exhibit I, 61:24-62:9; Exhibit S. Despite i) the lower earlier offers, ii) full awareness that the Travelers policies

issued did not 'stack,' and iii) the real doubts about whether any losses would be covered, Shelter Cove terminated its appointed counsel on the eve of trial and agreed to settle for an inflated sum of $1.5 million. Throughout the underlying action, the association and its directors insisted that nobody did anything wrong and that there were valid defenses to the Plaintiffs' claims. *See* Exhibit J, 21:22-24:21; Exhibit K, 11:1-12:11. Conversely, Plaintiffs' testimony in this case reveals they stood behind their allegations of fraud throughout the entirety of the underlying action. *See* Exhibit H, 32:20-35-9, 66:25-68:10; Exhibit I, 31:24-33:24. No reasonable person in Shelter Cove's position, knowing that the Policy had a limit of $ 1 million (which had been significantly reduced by five years of defense costs), that Shelter Cove had several legitimate defenses to Plaintiffs' claims, and that if liability was established there was likely no coverage under the Policy for a significant portion of the alleged losses, would have settled for an amount well above Plaintiffs' previous settlement offers. Regardless, the amount and apportionment of damages were never actually litigated, so Travelers had no opportunity to contest the inflated amounts Plaintiffs sought.[13]

Additionally, the settlement was entered into in bad faith, which invalidates a *Coblentz* agreement. *See Steil*, 448 So. 2d at 592. Florida courts have not yet provided a thorough exposition of what constitutes bad faith in these cases, but "collusion" and "false claims" have been referenced as obvious examples. *See Chomat*, 910 So. 2d at 538. Despite the relative dearth of case law in Florida tackling this issue, other courts have found that cooperation between initially adverse parties resulting in a judgment in excess

---

[13] Issues and legal conclusions agreed to by parties in a settlement are not considered actually "litigated" simply by a court's approval of a stipulation to judgment. *See Spencer v. Assurance Co. of America*, 39 F.3d 1146, 1149 (11th Cir. 1994).

of policy limits against an insurer may evidence bad faith. *See, e.g., Cont'l Cas. Co. v. Hempel*, 4 Fed. Appx. 703, 717 (10th Cir. 2001) ("Among the indicators of bad faith and collusion are unreasonableness, misrepresentation, **concealment**, secretiveness, **lack of serious negotiations on damages, attempts to affect the insurance coverage, profit to the insured, and attempts to harm the interest of the insurer**. They have in common **unfairness to the insurer**, which is probably the bottom line..." [emphasis added]).

This case has the hallmarks of bad faith highlighted in *Hempel.* Although the Amended Complaint and discovery focused on the allegations that Shelter Cove engaged in conduct that constituted intentional misrepresentation and conspiracy (e.g., the backdating of rebuild letters), as well as the misappropriation of insurance funds, in order to bring the settlement into coverage to entice the Plaintiff into settling the matter and not pursuing any potentially uncovered claims, Shelter Cove agreed to base the entry of judgment entirely on negligence, conveniently ignoring every other count in the complaint and the acts of dishonesty that discovery revealed. The resulting agreement purportedly legitimizes Plaintiffs' bloated damages and excessive legal fees, and it is hardly fair to Travelers, which defended the action for years despite persistent uncertainty about the existence of coverage under the Policy, to force Travelers to shoulder this liability.

Testimony from the Plaintiffs further bolsters the conclusion that the settlement was not entered into in good faith, or at least that it was unreasonable. Plaintiff Saliba testified at deposition that the amount the parties eventually "settled" for *fully compensated* the Plaintiffs for their damages (i.e., the Final Judgment granted Plaintiffs the entire amount they sought). *See* Exhibit I, 48:2-49:20. A settlement generally implies some sort of compromise on the part of both parties, but "settling" with the Plaintiffs for over $1.5

million—making them completely whole—evidences no such compromise. If Shelter Cove was willing to simply accept Plaintiffs' offer and capitulate fully to the Plaintiffs' demands, then there is no reason why the case should not have gone to trial. Shelter Cove entered into a "settlement" that embodied Travelers' worst-case outcome at trial, which is unreasonable and unfair to Travelers, especially considering that pursuant to the Policy, Travelers had the right to control the defense and resolve the matter.

**CONCLUSION**

For the reasons set forth herein, and based on the cited authority, the Final Judgment in the underlying action is unenforceable against Travelers and Plaintiffs are not entitled to recover any portion of the state court judgment from Travelers.

By: /s/ ***Andrew V. Tramont***
ANDREW V. TRAMONT, ESQ.
Florida Bar No.: 322830
RODRIGUEZ TRAMONT GUERRA & NUÑEZ, P.A.
***Attorneys for Travelers Casualty and Surety Company of America***
255 Alhambra Circle, Suite 1150
Coral Gables, Florida 33134
Telephone: (305) 350-2300
Fax: (305) 350-2525
avt@rtgn-law.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 30th day of September, 2013, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ ***Andrew V. Tramont***
ANDREW V. TRAMONT, ESQ.